STATE OF TENNESSEE    HARDEMAN COUNTY
Billy Davis, Clerk of the Circuit and General
Sessions Court certify that the foregoing is a true & correct
copy of _motion_ as appears of
record in my office. Witness my hand and seal this 28
day of _April_ 2020

Billy Davis
Circuit & General Sessions Clerk, Hardeman County, TN

**IN THE CIRCUIT COURT FOR TENNESSEE
TWENTY-FIFTH JUDICIAL DISTRICT
HARDEMAN COUNTY AT BOLIVAR**

**AFFORDABLE CONSTRUCTION,
SERVICES, INC.,**

    **Plaintiff,**

**v.**

**GRAND VALLEY LAKES PROPERTY
OWNERS ASSOCIATION, INC., and
OWNERS INSURANCE COMPANY,**

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)

**Docket No. 2018-CV-48**

FILED
CIRCUIT & GENERAL SESSIONS
COURT
10-10-19
AT _____ AM _1:51_ PM
BY _____ BILLY DAVIS, CLERK
HARDEMAN COUNTY, TENNESSEE

---

### DEFENDANT GRAND VALLEY LAKES PROPERTY OWNERS ASSOCIATION, INC.'S MOTION TO DISMISS

---

COMES NOW, Defendant Grand Valley Lakes Property Owners Association, Inc., hereafter "Grand Valley" or "GVL" and pursuant to T.R.C.P. 12.02(6) would file this *Motion to Dismiss.*

### STATEMENT OF THE CASE AND RELEVANT FACTS

Plaintiff filed its complaint on December 28, 2018, alleging in relevant part causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, and violation of T.C.A. 56-7-111.

Defendant Grand Valley owns facilities in Hardeman County, Tennessee that include a large "club house" type building, two water tanks and pump houses, a maintenance building, a security booth/front gate building, and a marina. (Com. ¶ 3). On December 23, 2015, a severe windstorm caused damages to the various structures on the property. (Com. ¶ 5). According to Plaintiff, Grand Valley reported the damage to their

1

EXHIBIT 3

Case 1:20-cv-01016-STA-jay   Document 20-4   Filed 05/05/20   Page 2 of 27   PageID 125
10/10/19 10:50AM PDT Law office of George R. Fusner, Jr. -> Hardeman Co Circuit
7316584584 Pg 3/28

insurance company, Defendant Owners Insurance Company, ("Insurer"). However, Insurer denied the claim. (Com. ¶ 5).

Plaintiff states that following the denial by Insurer, Grand Valley, through the apparent authority of its president, Ms. Myra cox, entered into a contractual relationship with Plaintiff, whereby Grand Valley assigned its benefits under its insurance policy to Plaintiff and Grand Valley gave Plaintiff the right to act in settling the claims made by Grand Valley against the Insurer. As consideration, Plaintiff claims that it made temporary repairs in the amount of $10,625.29. Plaintiff claims it subsequently worked with Grand Valley in determining the cost for repairs and submitted a preliminary insurance claim to Insurer in the amount of $118,402.73. Insurer rejected the claim. (Com. ¶ 6).

Grand Valley eventually brought suit against Insurer and a settlement was reached on or about November 20, 2017. Plaintiff believes it should have been named as the payee on the settlement check and that failure to be so named violated Tennessee law. (Com. ¶ 7).

On February 27, 2018, Grand Valley notified Plaintiff that it needed to submit a bid for the repairs. Plaintiff did not win said bid and the repair work was performed by another party. (Com. ¶ 8 and 10).

### STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6), the trial court must determine whether the pleadings state a claim upon which relief may be granted. A Rule 12.02(6) motion tests "only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). The resolution of such a

2

motion is therefore determined by an examination of the pleadings alone. Id. The court
should grant the motion to dismiss only if it appears that the plaintiff cannot establish any
facts in support of the claim that would warrant relief. *Doe v. Sundquist*, 2 S.W.3d 919,
922 (Tenn. 1999).

LEGAL AUTHORITIES AND ARGUMENT
SUMMARY OF DEFENSES SUPPORTING MOTION TO DISMISS

Following are the legal authorities and argument supporting the grounds for
dismissal based only on admissions in the Complaint and the language contained in
Exhibit A, the alleged "contract"

I

.GVL is not a party to the alleged "contract", which is Exhibit A. The name of Defendant
Grand Valley Lakes Property Owners Association, Inc. (GVL) does not appear in
Exhibit A as the party allegedly contracting with Plaintiff. Instead the name "Myra
Cox" is stated in the blank following "NAME". Likewise, there is no signature on behalf
of Defendant GVL in the signature block, only "Myra Cox". Exhibit A shows that
"Grand Valley" was written above the signature of Myra Cox in the handwriting that
was placed on it after Ms. Cox signed it by persons other than Ms. Cox. The copy
given to Ms. Cox did not contain that belated insertion, meaning that Plaintiff inserted
its copy at some later date. A copy of the document signed by Ms. Cox is attached
as Exhibit A-1 to this brief. There is no document showing that GVL ratified or
approved Exhibit A.

3

As stated in 3 C.J.S. Agency § 410 (1973), "[a] principal is bound neither by contracts made by a person not his agent, nor by those of his agent beyond the scope of his actual and apparent authority, which he has not ratified and is not estopped to deny." See also *Bagley & Co. v. Union-Buffalo Mills Co.*, 9 Tenn.App. 63, 67–68 (1928).

II

Exhibit A is incomplete and does not contain any specifications, quantities, qualities, scope of work or price which prevents the party's minds from meeting on such essentials for a repair of Property. As such, it is an unenforceable agreement to repair a roof. On the first page of Exhibit A under the heading "Specifications" there are none in any of the categories listed, such as roof type, pitch, color, valley, vents, gutters, downspouts, miters, fascia, soffit, siding, etc. Under Notes, there is nothing to describe the work or the PRICE, either there or in the block for "Bid Estimate". Above the blank for the Bid Estimate is a box for "Insurance Claim" which states that "This contract is for the amount of the Insurance Proceeds, but no figure is given. The Complaint and Exhibit A show that there were no insurance proceeds, which were an unknown amount at that time, and that a bid or estimate would be prepared in the future by Plaintiff.

To be enforceable, a contract must result from a meeting of the minds, be based on sufficient consideration, and be sufficiently definite. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." *See Four Eights, L.L.C. v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App.

4

2005) (quoting *United Am. Bank of Memphis v. Walker*, 1986 WL 11250 (Tenn. Ct. App.

1986) (quoting *King v. Dalton Motors, Inc.*, 260 Minn. 124, 109 N.W.2d 51 (1961).

Because of these unknowns and the unknown price or the amount that would be approved

by the insurance carrier, Exhibit A is unenforceable and is not an agreement.  The

complaint seeking to enforce Exhibit A should be dismissed on this ground alone.

### III

Exhibit A, to the extent that Plaintiff plans to submit an estimate or bid in the

future, then it is, at most, an agreement to agree if Plaintiff can provide an estimate

for permanent repair of the Roof that is acceptable to GVL and to Insurer.Agreements

to agree are not enforceable contracts.

When a term is left open for future negotiation, there is nothing more than an

unenforceable agreement to agree. *See Four Eights, L.L.C. v. Salem*, 194 S.W.3d 484,

486 (Tenn. Ct. App. 2005); also *Lire, Inc., v. Bob's Pizza Inn Restaurants, Inc.*, 541

N.W.2d 432 (N.D.1995)(agreement to agree is unenforceable—terms so indefinite that it

fails to show mutual intent). Exhibit A is not enforceable due to its lack of specifications

and price as cited above.

For example, Exhibit A states as follows on the back of the form used by Plaintiff:

> "This Agreement allows Affordable ConstructionServices,Inc. and its
> representatives to act upon the interests in the insurance claim(s) stated.
> This agreement hereby gives Affordable Construction Services, Inc. the
> right to act in settling the claim(s) stated by the insured.  Affordable
> Construction Services, Inc. will attempt to gain the maximum amount due
> to the insured by inspecting any and all damages caused by any insurance
> covered claims. Once the claim amount has been settled, Affordable
> Construction Services, Inc. and the owner/insured agrees the Affordable
> Construction Services, Inc. is obligated to perform the necessary repairs

5

and/or rebuilds stated in the claim within 30 days depending on weather conditions, material delays and/or prior work scheduled. Upon commencement of the repair and/or rebuilds, both parties will engage in this legal contract and or attached paper work describing work performed."

This paragraph shows on its face that Plaintiff intended to prepare a summary of damaged areas and an estimate to repair of the Property and get it approved by GVL and by GVL's insurance carrier, Defendant Owners Insurance Carrier (Insurer). Both future events that would require GVL and Insurer to approve the bid specifications prepared by Plaintiff and to approve the amount that the Insurer would pay under the policy and would require Plaintiff to agree with the amount that Insurer was willing to pay if that figure was lower than Plaintiff's bid/estimate. All of those future variables that required the agreements of all three entities placed Exhibit A squarely and undeniably, at most, as an agreement to agree on future unknown figures, specifications and prices and thereby unenforceable. The Complaint cannot survive this basic principle and should be dismissed on this ground alone.

IV

Exhibit A is illusory because any promise by Plaintiff to install a roof is subject to being "terminated at any time prior to commencement of work" and there is no mutuality of obligation on the parties. Plaintiff was not bound by Exhibit A to perform and could decline to work under its estimate if the Insurer did not approve its estimate or price.

A promise is illusory when it fails to bind the promisor, who retains the option of not performing; an illusory promise is not consideration for a return promise, and so cannot be the basis for finding a contract. See *Rode Oil Co. v. Lamar Adver. Co.*, No. W2007–02017–COA–R3–CV, 2008 WL 4367300, at *10 (Tenn.Ct.App. Sept.18, 2008).

t Exhibit A contains the following option to cancel by Plaintiff whereby Plaintiff can avoid any obligation under Exhibit A. This "loophole" for the Plaintiff is found on the first page and states:

"All contracts are subject for review by the home office and may be terminated at any time prior to commencement of work."

Exhibit A was not signed by a person authorized to commit Plaintiff, but by a salesman, Juan Blanco. The above clause allowed Plaintiff to terminate the alleged "contract" any time before it started work. Simply stated, if the Insurer did not approve Plaintiff's bid/estimate and would only authorize a lower figure that did not allow Plaintiff, in its discretion, to make a sufficient profit, then Plaintiff was not obligated to perform under Exhibit A.

There is an interesting anomaly with that clause. It does not limit either party from terminating the alleged "contract" before Plaintiff started work. Plaintiff's complaint admits that it never began work under its bid/estimate because Insurer did not approve Plaintiff's bid/estimate and no settlement of GVL's claim was achieved by Plaintiff.


V

Exhibit A states that Plaintiff planned to undertake the preparation of and submission of its bid/estimate to repair the storm damage to GVL's Property to Insurer for its approval. The Complaint admits that approval was not given by Insurer and that Plaintiff did not achieve any settlement , thereby admitting that the contingency and condition upon which any arguable rights of Plaintiff depended did not occur. These are undisputed facts admitted by Plaintiff in Exhibit A and its Complaint which provide another

separate ground rendering Exhibit A unenforceable and warrants dismissal of the Complaint. The Complaint goes further and admits that GVL had to hire an attorney and sue Insurer before GVL obtained a settlement of its disputed claim.

A condition precedent in the law of contracts may be a condition which must be performed before the agreement of the parties shall become a binding contract or it may be a condition which must be fulfilled before the duty to perform an existing contract arises. 17A C. J. S. Contracts s 338. No liability under the contract attached either to plaintiff or defendant until such time as the condition precedent was fulfilled. *Real Estate Management, Inc. v. Giles*, 41 Tenn.App. 347, 353, 293 S.W.2d 596, 599 (1956). The failure of Plaintiff to obtain approval of Insurer of GVL's claim using Plaintiff's damage repair bid/estimate is a failure of the contingency and condition upon which Plaintiff's rights to perform any permanent repair work depended. The Complaint should be dismissed on the failure of contingency and condition alone.

VI

Assuming, arguendo, that Exhibit A is a contract, the Complaint admits that Plaintiff failed to perform its task to get the GVL claim approved by GVL's Insurer. Failure of performance is a breach. The Complaint states that Plaintiffs failure to get the claim approved by the Insurer occurred before GVL allegedly breached. While GVL denies any breach, the Complaint clearly alleges that any breach by GVL did not occur until after Plaintiff failed to perform by obtaining Insurer's approval of GVL's claim. The Complaint recognizes GVL then had to sue Insurer and after GVL reached its own settlement of that litigation, GVL then allegedly breached by requiring Plaintiff

8

to submit a bid with specifications and a price. A first non-performing party cannot get damages from a later breaching party.

The first-to-breach rule, states that: "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn.Ct.App.1990). Based on the undisputed admissions in Exhibit A and Complaint, this first to breach rule is another separate ground which supports dismissal.

VII

Exhibit A does not bind GVL to hire Plaintiff even if Plaintiff succeeds in getting the Insurer to approve Plaintiffs bid or estimate. Exhibit A is a form prepared and used by Plaintiff and any interpretation of ambiguities is resolved in favor of GVL.

Again the first paragraph on the back of Exhibit A states, in part

".......Once the claim amount has been settled, Affordable Construction Services, Inc. and owner/insured agrees (sic) that Affordable Construction Services Inc. Inc. (sic) is obligated to perform the necessary repairs and/or rebuild state in the claim within 30 days depending on weather conditions, material delays and/or prior work scheduled."

It includes the statement which obligates Plaintiff to the "contract" once it starts work, but does not obligate GVL to hire Plaintiff if Plaintiff does not intend to do the work according to GVL's specifications, quality, quantity, scope of work and approved price.

Further, this clause does not obligate GVL to hire Plaintiff without approving the proposed work, but it does obligate Plaintiff to perform in accordance with its bid/estimate that is part of the claim that Plaintiff achieved on behalf of GVL At most, there is an ambiguity on whether an obligation on GVL can be read into Exhibit A to do all work in

9

Plaintiff's bid/estimate without Plaintiff achieving the settlement or by GVL approving

same. Tennessee courts adhere to the general rule that ambiguities in a contract are

construed against the drafter. E.g., *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d

528, 531 (Tenn.1991) (citing *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590

(1968); *Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn.Ct.App.2005) (citing *Certain*

*Underwriter's at Lloyd's of London v. Transcarriers Inc.*, 107 S.W.3d 496, 499

(Tenn.Ct.App.2002)). That rule would cause any interpretation resolved in favor of GVL

and against Plaintiff. This is a separate ground that precludes enforcement of Exhibit A

for not engaging Plaintiff to determine the scope of work and price desired by GVL and

by requiring Plaintiff to submit a bid/estimate to GVL that contained the specifications and

scope of work stipulated by GVL for its Property at a price acceptable to GVL.

There is no clause in Plaintiff's form Exhbit A that requires GVL to hire Plaintiff after

Plaintiff failed to obtain the settlement and GVL then succeeds in hiring its attorney, sues

Insurer and obtains a settlement with Insurer.

VIII

Plaintiff never alleges that it obtained GVL's signature on any proposed

written estimate or bid that set out specifications for quantities, qualities, scope of

work and price for permanent repairs to GVL's Property other than Exhibit A, *which*

*contains none of those necessary details for a contract to repair a damaged roof.*

The Complaint admits that Plaintiff never performed any of the permanent repairs

on GVL's Property and is not entitled to any payment for such work.

See *Bagley & Co. v. Union–Buffalo Mills Co.*, 9 Tenn.App. 63, 67–68 (1928); *Four*

*Eights, L.L.C. v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005); *McClain v.*

10

*Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn.Ct.App.1990). They deny relief to a party who seeks to enforce an agreement with another, but fails to secure the other party's approval of terms,which, in this case are certain specifications, quantity, quality, scope of work or the ultimate price for the task. That omission is critical and fatal to any relief for Plaintiff based on Exhibit A or otherwise.

IX

Plaintiffs Complaint fails to seek damages for the temporary work that it alleges was "consideration" for Exhibit A. Plaintiff's Complaint fails to tell the Court that GVL paid Plaintiff $10,625.29 for the temporary work which occurred before Plaintiff attempted to resolve the claim with Insurer. Because Plaintiff was paid by GVL for the temporary work,  how could that temporary work be unpaid "consideration" for e Exhibit A? Rarely has such a false allegation coupled with a material omission "backfired" on the pleader.

"A party attempting to prove the existence of a contract 'is required to show that the agreement on which he relies was supported by adequate consideration [.]' " *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn.Ct.App.1999) (quoting *Price v. Mercury Supply Company, Inc.,* 682 S.W.2d 924, 933 (Tenn.Ct.App.1984)). The absence of consideration "renders the contract, undertaking, or promise void and unenforceable as between the parties." 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 5:1 (2007). There is a failure of consideration also in that Plaintiff failed to obtain approval of its bid/estimate by Insurer.  To the contrary, Plaintiff's efforts resulted in a denial of the claim by Insurer which not only was a failure of contingency and condition as set forth in V above and failure of performance as set forth in VI above, butalso a failure of

11

consideration. Plaintiff's efforts aggravated the circumstances as admitted in the Complaint by resulting in GVL's claim being denied by Insurer. The Complaint admits that there was no performance of work by Plaintiff on the permanent repairs on the Property after GVL forced Insurer, through litigation, into a settlement. If Plaintiff failed to submit an acceptable bid/estimate after it had an opportunity to successfully contract with GVL afterwards, that is not a breach of any contract by GVL.

Exhibit A contemplates that Plaintiff would only be paid according to work done after Plaintiff achieved approval of its proposed work and price with Insurer. Plaintiff did no work under its bid/estimate because Insurer did not approve it and GVL did not enter into any subsequent agreement with Plaintiff for the permanent repairs to the Property. Having done no work, there is no consideration due Plaintiff which is yet another ground for dismissal of the Complaint.

X

Plaintiff's Complaint admits that it did no work pursuant to any bid/estimate for GVL or work under a claim that Insurer approved. Accordingly, Plaintiff's action against Insurer for alleged failure to include Plaintiff on the settlement check which resolved GVL's separate litigation against Insurer must fail. The statute in question, TCA 56-7-111, is inapplicable where there is no past unpaid work done by the contractor and there is no agreement between the property owner and the contractor to perform future repair work. Plaintiff was paid in full for the temporary repair it completed for $10,625.29. (See answer Paragraph 15). Plaintiff had done no permanent repair work on the Property and had no contract with GVL to do any such work. There was no basis for Plaintiff to be an additional payee on the settlement check paid by Insurer.

12

Finally, Plaintiff's Complaint shows that it suffered no loss because it was not a payee on GVL's settlement with Insurer.  Plaintiff was previously paid in full for its temporary work and Plaintiff performed no permanent work on the Property, as admitted in the Complaint.

XI

Exhibit A contains language whereby Plaintiff, a corporation that serves as a roofing contractor, undertakes to "act upon the interests of GVL, a corporation, in getting its insurance contract "claims" for storm damages approved by GVL's property insurer. Such an undertaking is unenforceable as an effort at the unlawful practice of law without a license by Plaintiff. The exact language is:

> "This agreement hereby gives Affordable Construction Services, Inc. the right to act in settling the claim(s) stated by the insured. Affordable Construction Services, Inc. will attempt to gain the maximum amount due to the insured by inspecting any and all damages caused by any insurance covered claims."

The Supreme Court of Tennessee possesses the sole and exclusive authority to regulate the practice of law and to define the unauthorized practice of law. *Id.* Only licensed attorneys may engage in the "practice of law" or the "law business" in Tennessee. *See* Tenn. S.Ct. R. 7, § 1.01.The practice of law is defined to be "the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any Court, commissioner, referee or anybody, board, committee or commission constituted by law or having authority to settle controversies. *Haverty Furniture Co. v. Foust,* 174 Tenn. 203, 124 S.W.2d 694 (1939) (citing 1935 Pub. Acts ch. 30 § 1). The "law business" was then defined as "the advising or counseling for a valuable

13

consideration of any person ... or corporation, as to any secular law, or the drawing ... for a valuable consideration of any paper ... affecting or relating to secular rights, or the doing of any act for a valuable consideration in a representative capacity, *obtaining or tending to secure for any person ... or corporation any property or property rights whatsoever.*" *Id.* (citing 1935 Pub. Acts ch. 30 § 1).

While a roofing company might properly furnish expert employees to provide opinions on the extent of damaged areas and a price for such work when Plaintiff moves from furnishing expert roof damage opinions to interpreting the insurance policy in an effort to "act upon the interests" of GVL, a corporation, for the purpose of a "maximum amount" in "settling the claim(s) stated by the insured", then Plaintiff has clearly crossed the line into an area reserved for the practice of law. Plaintiff's form alleged "contract" is little more than an unconscionable contingency arrangement to disregard the actual cost of repair, but to overstate such reasonable costs to "maximize" the amount an insurer will pay Plaintiff on its bid/estimate and then, upon achieving such maximum, obligate the owner/insured to use Plaintiff as the sole arbiter of all repairs, including specifications, quality of materials, quantity of materials, provisions for repair/replacement of damaged decking under damaged roof areas, scope of work and price.

## ADDITIONAL LEGAL ARGUMENT

Plaintiff's entire complaint is based upon the alleged contract between the parties which it claims to have attached a correct and accurate copy as Exhibit A to the Complaint.

Because this matter involves the interpretation of a contract, we must first consider

the applicable rules of contract interpretation. According to the Tennessee Supreme

Court:

> The canons of contract construction direct us to first look to the plain
> language of the contract and to ascertain and effectuate the parties' intent
> as reflected in that language. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95
> (Tenn.1999). Our focus is on the four corners of the entire contract, the
> circumstances in which the contract was made, and the parties' actions in
> fulfilling their contractual obligations. *Hughes v. New Life Dev. Corp.*, 387
> S.W.3d 453, 465 (Tenn.2012).
>
> If the contractual language is clear and unambiguous, the literal meaning of
> the contract controls the dispute. *Maggart v. Almany Realtors, Inc.*, 259
> S.W.3d 700, 704 (Tenn.2008), and the language used in the contract is
> construed using its "plain, ordinary, and popular sense." *Bob Pearsall
> Motors v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580
> (Tenn.1975). If, however, contractual provisions prove to be ambiguous
> (where more than one reasonable interpretation of the provision exists), the
> courts will employ other rules of contract construction to determine the
> parties' intent. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395
> S.W.3d 653, 659 (Tenn.2013). One of these principles is that ambiguous
> contract provisions will be construed against the drafter of the contract.
> *Kiser v. Wolfe*, 353 S.W.3d 741, 748 (Tenn.2011); *Betts v. Tom Wade Gin*,
> 810 S.W.2d 140, 143 n. 4 (Tenn.1991).

When a plaintiff alleges breach of contract, he or she is responsible for proving "(1)

the existence of an enforceable contract, (2) nonperformance amounting to a breach of

the contract, and (3) damages caused by the breach of contract." *Custom Built Homes v.

G.S. Hinsen Co., Inc.*, No. 01A01–9511–CV–00513, 1998 Tenn.App. LEXIS 89, at *8,

1998 WL 960287, at *3 (Tenn.Ct.App. Feb.6, 1998) (citing *Life Care Ctrs. of Am., Inc. v.

Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir.1996)).

## A.   GRAND VALLEY IS NOT A PARTY TO THE CONTRACT

Plaintiff's entire lawsuit relies upon the two page contract allegedly executed

between it and Grand Valley. However, it would appear that Grand Valley is not a party

to said contract. Plaintiff in its Complaint states that the contract was executed by Myra

Cox acting through her "apparent authority" as the President of the Grand Valley. (Com.

¶ 6). (Nowhere in Exhibit A is the word "President" written) Apparent authority is a

question of law and not of fact. As stated in 3 C.J.S. Agency § 410 (1973), "[a] principal

is bound neither by contracts made by a person not his agent, nor by those of his agent

beyond the scope of his actual and apparent authority, which he has not ratified and is

not estopped to deny." See also *Bagley & Co. v. Union–Buffalo Mills Co.*, 9 Tenn.App.

63, 67–68 (1928). Implied authority has been defined as:

> [A]ctual authority given implicitly by the principal to his agent; ... it is actual
> authority circumstantially proved, or evidenced by conduct, or inferred from
> a course of dealing between the alleged principal and the agent. It differs
> from apparent authority in that it is authority which the principal intended
> that the agent should have.
>
> ....
>
> .... Implied powers ... must be bottomed on some act or acquiescence of the
> principal, express or implied.
>
> ... their existence or nonexistence in any particular instance being always
> determinable by reference to the intention of the parties. 2A C.J.S. Agency
> § 153 (1972).
>
> Apparent authority is most often defined as:
>
> Such authority as the principal knowingly permits the agent to assume or
> which he holds the agent out as possessing; such authority as he appears
> to have by reason of the actual authority which he has; such authority as a
> reasonably prudent man, using diligence and discretion, in view of the
> principal's conduct, would naturally suppose the agent to possess.

*Rich Printing Co. v. McKellar's Estate*, 330 S.W.2d 361, 376 (Tenn.App.1959); see *V.L.*

*Nicholson Co. v. Transcon Inv.*, 595 S.W.2d 474, 483 (Tenn.1980).

It is well settled that apparent authority must be established through the acts of the principal rather than those of the agent. *E.g., Franklin Distrib. Co. v. Crush Int'l*, 726 S.W.2d 926, 931 (Tenn.App.1986). Such requirement was adopted by our state supreme court in *Southern Railway Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675 (1917), when stating:

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority.

*Southern Railway*, 197 S.W. at 677; see also *Franklin Distrib.*, 726 S.W.2d at 931.

There is nothing in the contract that would indicate that Myra Cox was acting on behalf of Grand Valley, was acting in her capacity as President, was binding Grand Valley to the contract, or that the contract was being entered into for the benefit of Grand Valley. There are no factual allegations in the Complaint that would support that Mrs. Cox was executing the alleged contract with actual or apparent authority. Simply making the conclusory statement that she had apparent authority is not sufficient.

Furthermore, it would appear that Plaintiff has actually altered the contract after execution of same. Plaintiff attached as proof to its Complaint (after Motion by Grand Valley) the alleged contract as Exhibit A. Said contract has the name "Grand Valley" written across the top. However, the copy of the contract provided to Myra Cox does not include such a designation. (See document attached as Exhibit A-1). The only way for Mrs. Cox to have a version of the document that is different from that produced by the Plaintiff is if the Plaintiff actually modified the document after the fact. It is easy to see

17

why Plaintiff would have modified the document to include the name "Grand Valley" sometime after execution because the actual document in no way binds Grand Valley.

## B.   THE DOCUMENT WAS ILLUSORY

"A party attempting to prove the existence of a contract 'is required to show that the agreement on which he relies was supported by adequate consideration [.]' " *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn.Ct.App.1999) (quoting *Price v. Mercury Supply Company, Inc.*, 682 S.W.2d 924, 933 (Tenn.Ct.App.1984)). The absence of consideration "renders the contract, undertaking, or promise void and unenforceable as between the parties." 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 5:1 (2007). Consideration may take a number of different forms, including a return promise. *See, e.g., Estate of Hordeski v. First Federal Savings and Loan Ass'n of Russell County, Ala.*, 827 S.W.2d 302, 304 (Tenn.Ct.App.1991) ("It may be a promise for a promise.").

However, "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." *Restatement (Second) of Contracts* § 77, cmt. a. This is referred to as an "illusory promise." A promise may be illusory because it "essentially promis[es] nothing at all, or allow[s] the promisor to decide whether or not to perform the promised act." *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F.Supp.2d 916, 929 (M.D.Tenn.2003) (citations omitted), *aff'd*, 400 F.3d 370 (6th Cir.2005), *cert. denied*, 546 U.S. 1030, 126 S.Ct. 730 (2005). Similarly, a "promise may also be illusory if it is too indefinite to be enforceable." *Id.* Therefore, a promise is illusory when it fails to bind the promisor, who retains the option of not performing; an illusory promise is not consideration for a return promise, and so cannot be the

18

basis for finding a contract. See *Rode Oil Co. v. Lamar Adver. Co.*, No. W2007–02017–COA–R3–CV, 2008 WL 4367300, at *10 (Tenn.Ct.App. Sept.18, 2008) (citations omitted).

First, Plaintiff, acting through its agent, Juan Blanco, approached Myra Cox in January, 2016 about the prospect of Plaintiff undertaking the opportunity to prepare and present an estimate of the repair cost of the damage to the Insurer in an effort to get the Insurer to approve that estimate as part of Grand Valley's claim and authorize Plaintiff to do the repair work in accordance with an estimate that was approved by Grand Valley and by Insurer. Exhibit A reflects Plaintiff's intention to undertake that opportunity. Exhibit A was not an agreement to hire Plaintiff to do the repair work on the Insured Structures and there was no estimate contained in Exhibit A. The blanks on the first page for specifications and price for the proposed work were not completed.

Second, Exhibit A contains the statement that "All contracts are subject for review by the home office and may be terminated at any time prior to commencement of work." This would appear to show that the "contract" was in fact nothing but an illusory promise. First, Juan Blanco, the salesman, did not have authority to bind Plaintiff to any contract with Grand Valley because the agreement by its own terms was "subject to review by home office."

Third, Plaintiff was not bound because it had the right to terminate any "contract" before it commenced the work under that "contract." This "kick-out" option meant that, even after Plaintiff submitted an estimate for work, that it could unilaterally terminate the "contract" prior to commencement of the work. Furthermore, the language used in the document shows that Plaintiff could terminate the contract if the insurance carrier did not approve Plaintiff's estimated price. In other words, if the insurance company would not

19

approve Plaintiff's estimated price for repairs, then Plaintiff did not consider itself bound under the alleged contract. There is no mutuality of obligation on behalf of Plaintiff in the alleged contract because it retains the right to terminate while it asserts that Grand Valley was nonetheless obligated to the terms of alleged contract. Plaintiff's legal theory becomes increasingly troublesome when one realizes that there is no estimate or quote showing the proposed specifications of quantity and quality and scope of work and no price to be charged by Plaintiff and that presumably Grand Valley would have to pay whether these figures ultimately proved to be reasonable or not. Simply put, the promises made by Plaintiff in the document are nothing but illusory in nature.

Finally, Plaintiff attempts to claim that it made temporary repairs as consideration and that said repairs totaled $10,625.29. (Com. ¶ 6). However, nowhere in Exhibit A are temporary repairs considered or mentioned, and much less are they to be considered as consideration. Plaintiff, prior to preparing and presenting its estimate to the insurer, was hired by Grand Valley to perform limited temporary emergency type repairs to preserve the damaged property from subsequent weather exposure. This was separate from the alleged contract and Grand Valley engaged Plaintiff to perform that temporary emergency type repairs for which Plaintiff billed Grand Valley $10,625.29. Grand Valley paid this bill. (See Answer Paragraph 15) That work was done in consideration for payment, which was done. There are no provisions in the alleged contract, the alleged "contract", for this temporary work and the insurer's approval was not needed for that work and no estimate was given or sought by Plaintiff for it. Grand Valley acknowledged the hiring of Plaintiff to perform the temporary repairs and paid Plaintiff. While Plaintiff may have accepted performing the temporary work to gain an advantage working with Grand Valley, that was

20

not a part of Exhibit A and such temporary work was billed separately from any estimate presented to the insurer and was paid by Grand Valley. There was no contractual "quid pro quo" between the temporary work and the undertaking by Plaintiff to gain the insurer's approval of Plaintiff's estimate and none is stated in the alleged contract.

## C. PLAINTIFF WAS FIRST TO BREACH THE CONTRACT

Even assuming there existed a binding agreement between Plaintiff and Grand Valley, it was Plaintiff who was the first to breach the terms of the contract. The first-to-breach rule, states that: "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn.Ct.App.1990)

### (i)   Plaintiff Failed to Obtain Insurer's Approval.

Exhibit A states in the first paragraph on the second page, that Plaintiff would present its estimate to the insurance carrier and obtain the carrier's approval for Plaintiff to do the repair work according to Plaintiff's approved estimate of repair. It further states that approval by the insurance carrier of Plaintiff's estimate and of Plaintiff to do the work by the insurer must be accomplished by Plaintiff before Plaintiff is "obligated to do the work." The Complaint admits that Plaintiff failed to get the insurance carrier's approval to do any repair work or to get approval for Plaintiff to be the construction company to perform said work.  To the contrary, the Complaint admits that Grand Valley had to hire its own attorney to sue its insurance carrier. Plaintiff failed in every way in its dealings with insurer and never succeeded in securing approval, a condition precedent to the contract. Rather, Grand Valley had to seek judicial intervention in the matter at great cost to itself.

21

Additionally, Exhibit A does not state that Plaintiff, having failed to obtain the condition precedent of Insurer's approval of its estimate and approval of it as the contractor, would still be entitled to do the work according to its estimate if Grand Valley hired an attorney and litigated with its Insurer. Plaintiff failed to perform this critical condition precedent on which all of Grand Valley's alleged future obligations stemmed. Plaintiff essential admits in the Complaint that it failed to secure Insurer approval and that settlement with Insurer was obtained by Grand Valley alone, and that after settlement was reached that Grand Valley was required to use Plaintiff as its contractor. Assuming arguendo that Exhibit A to the Complaint is an agreement, there is no clause therein that can even be remotely construed to reach such a ludicrous conclusion and none is cited by Plaintiff.

(ii)   Subsequent Failures by Plaintiff.

Plaintiff's failure to reach an agreement with the Insurer and to obtain approval of any estimate, created a negative domino effect with the duties as stated in the alleged contract. The document did not contain any specifications for goods and labor or on price. Specifically, there are no specifications for products, quantity or quality for the repairs and no price for such work contained therein. These are key components on which the parties must reach a mutual agreement. Due to Plaintiff's above stated performance failure, it likewise never obtained Grand Valley's signature on any document containing an estimate and the Complaint fails to allege to the contrary. Plaintiff needed to prepare an estimate showing the specifications for the quality and quantity and scope and extent of work for the proposed repairs along with the price for such proposed work. Next, Grand Valley would have needed to review the estimate and sign its approval to it. Then, Plaintiff

22

needed to present its approved estimate to the Insurer for its final approval of the scope,

quality, quantity and price for the repair work. Finally, the Insurer was required to approve

Plaintiff as the contractor to perform such work. At which point, the alleged contract

"obligated" Plaintiff to do the work. The first paragraph on the back of alleged contract

does not obligate Grand Valley under the contract, until Plaintiff begins work pursuant to

its estimate following approval by **BOTH** Grand Valley and the Insurer. The Complaint

shows on its face that none of these conditions precedent were achieved or occurred.

## CONCLUSION

For the numerous legal principles and defenses stated herein, the Complaint

must be dismissed with prejudice as to Defendant Grand Valley for failing to state a

cause of action upon which relief can be granted.

Respectfully submitted,

George R. Fusner, Jr. (BPR #005614)
Attorney for Grand Valley Lakes Property
Owners Association, Inc.
Partin Ray Building
7104 Peach Court
Brentwood, TN 37027
Telephone: (615) 251-0005
Facsimile: (615) 379-2303
E-mail: gfusner@aol.com

Richard E. Charlton, (BPR #007791)
Attorney for Grand Valley Lakes Property
Owners Association, Inc.
2725 Lombardy Avenue
Memphis, TN 38111
(P) (901) 483-1643
Email:rcharlton@winchesterlawfirm.com

23

**This Motion is expected to be heard on November 1, 2019 at 9:00 a.m. in the Circuit Court for Tennessee Twenty-Fifth Judicial District, Hardeman County at Bolivar.**

### CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was emailed and mailed, postage prepaid, to the following:

Mr. Randall N. Songstad
Rsongstad@gmail.com
254 Court Avenue, Ste. 213
Memphis, TN 38103

on this ___ day of October, 2019.

George R. Fusner, Jr. (BPR #005614)

24

# Exhibit 1-A





For Mail-In Payment:
319 Vann Drive E214
Jackson, TN 38305
888-766-4697
office@afconstruction.net

Salesman Cell# 7313771535
Fax: 888-400-5523
Lic # 63088
www.afconstruction.net

**Affordable Construction**

BBB MEMBER

NAME *MYRA COX*     PHONE# 7313760116     DATE 01-26-16

JOB SITE *405 grand valley dr*     WORK / CELL

CITY *Salisbury*     STATE *TN*     ZIP *38067*     FAX

INSURANCE CO:     CLAIM #

ADJUSTER(S)     POLICY #

ADJUSTER(S)     DEDUCTIBLE

**ROOF TYPE:**
- [ ] FLAT ____ sq ft [ ] SLOPE ____ sq ft
- [ ] TEAR OFF: [ ] YES [ ] NO ____ LAYERS
- PITCH ____ :12 STORIES ____
- COLOR OF ROOF: ____
- HIP & RIDGE FT ____
- VALLEY: ____
- VENTS:
- [ ] RV FT ____ [ ] POWER VENT:# ____ COLOR ____
- [ ] TURBINE # ____ COLOR ____
- [ ] PIPE JACKS: #1-3 ____ #3-4 ____ ELECT: ____
- [ ] DRIP EDGE: COLOR ____ FT ____
- [ ] PROTECT LANDSCAPING WHERE APPLICABLE

**SPECIFICATIONS**
- [ ] GUTTERS: COLOR ____ FT ____
- [ ] DOWNSPOUTS: 1 STORY # ____ 2 STORY # ____
- [ ] MITERS: OS# ____ IS# ____ BIS# ____ BOS# ____
- [ ] FASCIA: COLOR ____ SMOOTH FT ____
- COLOR ____ WOODGRAIN FT ____
- [ ] SOFFIT: COLOR ____ VENTED FT ____ SOLID FT ____
- [ ] SIDING: COLOR ____ FT ____ TYPE ____
- [ ] IC: # ____ COLOR: ____ OC: # ____ COLOR: ____ STARTER FT ____
- [ ] J-CHANNEL ____ : COLOR ____ FT ____
- [ ] SCREEN DAMAGE ____
- [ ] GARAGE DOOR DAMAGE ____
- [ ] INTERIOR DAMAGE ____

NOTES:

Affordable Construction Services, Inc. guarantees against defective workmanship for a period of ____
All material is guaranteed to be as specified. All work to be completed in a workman-like manner according to standard practices. Any alteration or deviation from above specifications involving extra cost will be executed upon verbal or written orders and will become an extra charge over and above estimate. Affordable Construction Services, Inc. will carry workman's compensation and liability insurance in accordance with state requirements. Affordable Construction Services, Inc. will not be responsible for any damage to the interior of the home caused by a defective roof, nor for damage to a/c lines, electrical wires, plumbing or other items which may be installed too close to decking.

Homeowner agrees if payments are not made as specified in this contract, he/she will be responsible for any and all collection charges, attorney's fees and all court costs, plus additional late charge fees or $25.00 per day minimum. All contracts are subject for review by the home office and may be terminated at any time prior to commencement of work. No warranties will be issued until payment is made in full, including any and all extra charges for woodwork or alterations.

*Any rotted wood or hidden problems that need repairs before work can be completed will be charged at $35.00 per hour, per person, plus materials.

[✓] **Insurance Claim** - This contract is for the amount of the Insurance Proceeds X *Myra Cox*
[ ] **Bid Estimate:** ____ (Price reflects all discounts) Dollars ($ ____ )

PAYMENTS TO BE MADE AS FOLLOWS: ____ % DEPOSIT, THE REMAINING BALANCE + ADDITIONAL CHARGES DUE UPON COMPLETION.

NOTE: This contract may be withdrawn by us if not accepted within ____ days.

## ACCEPTANCE OF CONTRACT

Both sides of this contract, including the terms and conditions and any agreement executed in writing, pursuant thereto, between Affordable Construction Services, Inc. (the "Company") and the property owner(s) or property owner's representative(s) hereby referred to as the "customer" are subject to the laws in effect in the State in which it has been signed and executed. I, the customer/insured, hereby understand the contents of both sides of this contract and any and all questions that have been asked by the customer/insured have been answered by Affordable Construction Services, Inc.. The above prices, specifications, attached paperwork and conditions are satisfactory and are hereby accepted. Affordable Construction Services, Inc.. is authorized to do the work as specified. Payment will be made as outlined above.

DATE ____     SIGNATURE X ____     SALESMAN ____

## Affordable Construction Services, Inc. Formal Agreement

This agreement allows Affordable Construction Services, Inc. and its representatives to act upon the interests in the insurance claim(s) stated. This agreement hereby gives Affordable Construction Services, Inc. the right to act in settling the claim(s) stated by the insured. Affordable Construction Services, Inc. will attempt to gain the maximum amount due to the insured by inspecting any and all damages caused by any insurance covered claims. Once the claim amount has been settled, Affordable Construction Services, Inc. and the owner/insured agrees that Affordable Construction Services, Inc. Inc. is obligated to perform the necessary repairs and/or rebuilds stated in the claim within 30 days depending on weather conditions, material delays and/or prior work scheduled. Upon the commencement of the repair and/or rebuilds, both parties will engage in this legal contract and or attached paperwork describing work performed.

1. **Materials:** Unless elsewhere specified, the contractor shall have the right to select all materials. Affordable Construction Services, Inc. will make all reasonable attempts to coordinate with the owner as to the type and color of material to be replaced or repaired.

2. **Change Orders / Additional Work:** Change Orders, additional work, or alterations to the original estimate / scope of loss will be agreed upon by both parties. 50% of the cost for the change order or additional work is to be paid by the owner to Affordable Construction Services, Inc. at the time of request and agreement. The remaining 50% balance will be due upon completion.

3. **Labor and Material Not Included in Insurance Scope:** The agreement to perform repairs or construction does not include any labor or material not specifically mentioned in the estimate or scope of repairs. Any items not covered in the scope of repairs will be considered to be Change Orders / Additional Work, and treated as outlined in point # 2 above.

4. **Unavoidable Interruptions:** Affordable Construction Services, Inc. shall not be held liable for any loss, damage, or delay caused by acts of God, strikes, civil or military authority, or by any other cause beyond its control.

5. **Claims and Supplements to the Insurance Company/Carrier:** In the event that there are claims and/or additional repairs needed due to unseen conditions, Affordable Construction Services, Inc. will submit an estimate and/or supplemental estimate to the insurance company for the cost of these repairs. The funds paid by the insurance company for said claims will be paid by the owner directly to Affordable Construction Services, Inc. within seven days of receipt of said funds and completion of claim.

6. **Breach of Contract:** In the event of cancellation of this contract by insured/owner after the 3 day cancellation period, a 25% fee of the total insurance settlement will be paid to Affordable Construction Services, Inc. for coordination, writing estimates, and settlement of claim.

7. **Partial Work Order / Cancellation:** In the event the owner / insured authorizes to complete a specific portion of the work from the insurance scope, and cancels the remaining portion, the owner / insured will owe Affordable Construction Services, Inc. the full amount equal to the Replacement Cost Value (RCV) of the work completed, including applicable Contractor's Overhead and Profit. Owner / insured will also owe Affordable Construction Services, Inc. 25% of the Replacement Cost Value (RCV) of the work cancelled as outlined in point # 6 above.

8. **Cancellation:** The insured / owner will have three days from the time of signing the contract to decide to schedule or cancel work.

9. **Non Recoverable Depreciation:** In the event the owner / insured has a non recoverable depreciation policy, and the owner has Affordable Construction Services, Inc. complete all work as outlined in the insurance scope, the owner shall pay the full amount equal to the Replacement Cost Value (RCV) as settled with the insurance carrier. In the event the owner / insured cancels the work order, and has a non recoverable depreciation policy, Affordable Construction Services, Inc. will be paid 25% of the Replacement Cost Value (RCV) as outlined in point #6 above.

10. **Estimate Price:** Prices for material and labor associated with this agreement are good for 30 days from the date on the estimate provided to the insurance company / carrier. After 30 days, Affordable Construction Services, Inc. has the option to review labor and material prices and submit a new estimate to the insurance company / carrier to compensate for any changes in market prices.

11. **Warranties:** A warranty will be given after a Certificate of Satisfaction is signed by the owner / insured and after final balance is paid. A Certificate of Satisfaction must also be signed before the insurance company will release any applicable depreciation.

12. **Material and Mechanics Lien:** Affordable Construction Services, Inc. has the right to file a Material and Mechanics Lien on the above referenced property until such time as the total balance is paid in full.

13. **Process of Law:** In the event that a process of law is necessary by the contractor to collect balances due, the insured agrees to pay all costs related to such process if the insured is found in fault.

---

**"NOTICE TO OWNER"**

Under the Mechanics' Lien Law, any contractor, subcontractor, laborer, material man or other person who helps to improve your property and is not paid for his labor, services or material, has a right to enforce his claim against your property.

Under the law, you may protect yourself against such claims by filing before commencing such work of improvement, an original contract for the work of improvement or modification thereof, in the office of the county recorder of the county where the property is situated and requiring that a contractor's payment bond be record in such office. Said bond shall be in an amount not less than fifty percent (50%) of the contract price and shall, in addition to any conditions for the performance of the contract, be conditioned for the payment in full of the claims of all persons furnishing labor, services, equipment or materials for the work described in said contract.